The **STATE of TEXAS, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

v.

**GREYHOUND LINES, INC., and Trailways, Inc., et al, Intervening Respondents.**

Nos. 84–4184, 84–4249.

United States Court of Appeals, Fifth Circuit.

May 28, 1985.

Jim Mattox, Atty. Gen., Justin Scott Wilson, Asst. Atty. Gen., Austin, Tex., for petitioner.

William French Smith, Atty. Gen., John W. Powers, III, John P. Fonte, Antitrust Div., Dept. of Justice, John Broadley, Gen. Counsel, Edward J. O'Meara, I.C.C., Washington, D.C., for respondents.

Rebecca Patton, Trailways, Inc., Leroy Hallman, Dallas, Tex., for Trailways Lines, Inc. et al.

Lat J. Celmins, Robert D. Rierson, Phoenix, Ariz., for Greyhound Lines, Inc.

On Petitions for Review of Interstate Commerce Commission Decision Nos. MC–C–10893 and MC–C–10891.

Before JOHNSON and HILL, Circuit Judges, and BOYLE *, District Judge.

ROBERT MADDEN HILL, Circuit Judge:

## I. *Background*

This is a consolidated appeal in which the State of Texas seeks review of two Interstate Commerce Commission (ICC or Commission) decisions setting aside the decision of the Railroad Commission of Texas (RCT), which denied bus service rate increases requested by Greyhound Lines, Inc. (Greyhound). In proceedings before the RCT, Greyhound sought a 15% increase in its Texas intrastate passenger rates and package express rates and a 26% increase in its intrastate charter rates. Trailways Lines, Inc. (Trailways) intervened and submitted evidence supporting Greyhound's request. On November 28, 1983, the RCT denied the rate increases requested by Greyhound and adopted the recommendation of an examiner that Greyhound should receive only a 6.4% increase in its intrastate passenger, package express, and charter rates. The decision applied to all other intrastate motor bus carriers in Texas. Both Greyhound and Trailways, in separate proceedings, petitioned the ICC to review and set aside the RCT's decision.

In setting aside the decision of the RCT, the Commission acted under § 17 of the Bus Regulatory Reform Act of 1982 (the Bus Act), codified at 49 U.S.C. § 11501(e). Section 11501(e) significantly changed the relationship of state agencies and the ICC with respect to the regulation of intrastate bus transportation. It grants the ICC more extensive authority to preempt state regulation of intrastate bus rates. The ICC may preempt state regulation when (1) a carrier has requested a rate change and the state has denied that request in whole or in part, or has failed to act on the request within 120 days, and (2) the Commission finds that the challenged rate, rule, or practice in effect imposes an unreason-

able burden on interstate commerce. Section 11501(e)(2)(A) establishes three rebuttable presumptions concerning when an intrastate rate imposes an unreasonable burden on interstate commerce. Greyhound and Trailways sought to invoke the first of these, § 11501(e)(2)(A)(i), which provides that an intrastate rate imposes an unreasonable burden on interstate commerce if it "results in the carrier charging a rate for such transportation which is lower than the rate such carrier charges for comparable interstate transportation of passengers." One may rebut the presumption by establishing differences in operating conditions, services, or costs between intrastate and interstate operations sufficient to justify the rate disparity.

Before the Commission, the RCT argued that the presumption did not apply because, although the fares of Greyhound and Trailways for intrastate travel may have been less than the published fares for interstate travel, the statute requires the ICC to look at the rates actually charged, and the actual interstate rates of Greyhound and Trailways were lower than the intrastate rates when excursion fares, discount fares, and reduced rate fares (collectively excursion fares) were taken into account. The RCT supported its argument by citing evidence which indicates that the carriers' revenue per passenger-mile was higher for their intrastate operations than for their interstate operations.[1]

The Commission rejected the RCT's arguments in both the Greyhound and the Trailways proceedings for identical reasons. In rejecting the argument that an effective rate comparison must take into account excursion fares, the Commission invoked its general policy that such fares should not be taken into account because they are typically initiated for promotional or advertising purposes and frequently are effective only for limited time periods. The

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

**1.** The RCT erroneously assumes that since revenue per passenger-mile is higher for intrastate

transportation, then intrastate rates must be higher than interstate rates. *See* part III A, *infra.*

Commission also rejected the RCT's comparison of revenue per passenger-mile for intrastate and interstate services because the RCT did "not determine the relative profitability of these services, absent a similar comparison of costs." *Greyhound Lines*, ICC Decision No. 10893, at 4 (February 21, 1984). The Commission, faulting the revenue per passenger-mile data relied upon by the RCT because it compared intrastate trips with interstate trips of much greater average length, stated that "[w]e do not consider this to represent 'comparable transportation' within the meaning of the statute, particularly as it is well known that costs per passenger mile decline significantly with trip length." *Id.* at 5.

Consequently, in both decisions, the Commission found that the RCT's partial denial of the proposed passenger, package express and charter rate increases resulted in intrastate rates which caused unreasonable discrimination against, and imposed an unreasonable burden on, interstate commerce. It, therefore, approved the sought rate increases in full. The State of Texas, on behalf of the RCT, appeals both decisions of the Commission and the appeals have been consolidated. The issues and arguments are the same in both cases, except that the issue dealing with intrastate charter rates applies only to the action involving Greyhound, because Trailways did not challenge that issue before the Commission.

For the reasons that follow, the decisions of the Commission in these cases are reversed and both actions are remanded to the Commission in order for it to consider excursion fares in the process of determining whether intrastate rates are less than interstate rates. In all other respects, the decisions of the Commission are affirmed. In doing so, we hold that the rebuttable presumption of 49 U.S.C. § 11501(e)(2)(A)(i) does apply to package express rates and the ICC does have jurisdiction to prescribe intrastate charter rates and package express rates for a motor common carrier of passengers under § 11501(e).

## II. *Standard of Review*

■ We are called upon to review the propriety of a general policy of the ICC which excludes excursion fares from the comparison of intrastate and interstate rates required by § 11501(e)(2)(A)(i). Under this policy, upon comparing the intrastate rates with the published or non-discounted interstate rates, the Commission determined that the interstate rates were greater and that, consequently, a rebuttable presumption arose that maintenance of the intrastate rates unreasonably burdened interstate commerce.[2] To uphold the Commission's determination, the agency decision must satisfy the requirements of 5 U.S.C. § 706(2)(A) (1977). These requirements were fully explicated in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971):

Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 USC § 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into

**2.** Title 49 U.S.C. § 11501(e) grants to the ICC review of intrastate rates and sets out the presumptive burdensome effect on interstate commerce of a disparity, as found by the Commission, between intrastate and interstate rates. The statute, in pertinent part, reads as follows:

(1)(B) if the Commission finds that the rate, rule, or practice in effect and applicable to such intrastate transportation causes unreasonable discrimination against or imposes an unreasonable burden on interstate or foreign commerce.

(2) For purposes of paragraph (1)(B) of this subsection, there shall be a rebuttable presumption that—

(A) any rate, rule, or practice applicable to transportation provided by a motor common carrier of passengers entirely in one State imposes an unreasonable burden on interstate commerce if the Commission finds—

(i) that such rate, rule, or practice results in the carrier charging a rate for such transportation which is lower than the rate such carrier charges for comparable interstate transportation of passengers....

the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

401 U.S. at 416, 91 S.Ct. at 823 (citations omitted); *see also Central Power & Light Co. v. United States,* 634 F.2d 137, 149 (5th Cir.1980), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981).

Additionally, we are mindful that judicial review should be even more restrictive when, as respondents assert, "the Commission's interpretation is necessary to set in smooth motion the machinery of a new statute." In *National Cable Television Ass'n, Inc. v. Copyright Royalty Tribunal,* 724 F.2d 176 (D.C.Cir.1983), however, the court reiterated the standard enunciated in *Volpe* and stated that:

> [i]n all cases, we attempt to assure ourselves that the agency has fairly attended to prescribed procedures.... [I]f Congress entrusts a novel mission to an agency and specifies only grandly general guides for the agency's implementation of legislative policy, judicial review must be correspondingly relaxed. [On the other hand,] [i]f Congress sets precise guidelines for agency action, courts must tightly review the agency's directives to determine whether the congressional instructions have been observed.

724 F.2d at 181 (citations omitted). In this action, the statutory directive to compare intrastate and interstate rates charged by a carrier is not a "grandly general guide"; rather, it is a precise and specific guideline by which the ICC may presume, subject to rebuttal, the existence of an unreasonable burden on interstate commerce. See note 2, *supra.*

■ In *Western Coal Traffic League v. United States,* 719 F.2d 772 (5th Cir.1983) (en banc), *cert. denied,* — U.S. —, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984), we deferred to the regulations adopted by the ICC that were designed .to effectuate its statutory duties pursuant to the broad congressional directive to establish standards and procedures for making a market dominance determination. In our two proceedings, however, the ICC did not adopt or establish regulations to identify when intrastate rates imposed an unreasonable burden on interstate commerce; rather, it simply attempted to follow the specific congressional directive to compare intrastate and interstate rates. Consequently, we need not merely "defer to the agency's interpretation of the statute and affirm that interpretation if 'it has a reasonable basis in law'" as required by *Western Coal. Id.* at 777. Moreover, the Supreme Court has recently noted, in this context, that "[i]f the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* — U.S. —, —, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). *See also Western Coal, supra,* at 782–83 (Rubin, J. and Reavley, J., dissenting). As our opinion *infra* makes clear, the statutory term "rates charged" unambiguously evidences Congress' intent that the Commission compare the actual rates charged. Accordingly, we decline respondents' invitation to "relax" judicial review of the ICC's decision and instead accept the duty to "tightly review" that decision to ensure that it is in accordance with the statutory guidelines and that it "was based on a consideration of the relevant factors...." *Volpe,* 401 U.S. at 416, 91 S.Ct. at 823.

### III. *Passenger Service*

The State of Texas argues that it is impossible to determine the rates actually charged by Greyhound and Trailways from a review only of published rates because the carriers changed their rates daily by offering excursion fares;[3] consequently,

---

**3.** The parties heatedly dispute the length of time that excursion fares were employed and the rate at which the published fares were changed or turned over. As our decision does not necessitate the resolution of this issue, we leave its resolution for the Commission on remand.

Texas argues, the ICC erroneously failed to consider the rates the carrier "charges" *i.e.,* actually charges, regardless of the published rates. Texas also argues that its data—that intrastate revenues per passenger-mile exceed interstate revenues per passenger-mile—conclusively establish that intrastate rates of Greyhound and Trailways were higher than their interstate rates.[4] In responding to these arguments, the Commission defends its general policy of excluding excursion fares in comparing intrastate and interstate rates by asserting that these fares are effective for only limited periods and that consequently the published rate is, more often than not, the rate that is actually charged. The Commission also attacks the statistical logic underlying Texas' revenue per passenger-mile data. We will address the latter dispute first.

## A. Revenue Per Passenger-Mile

■ The State of Texas introduced evidence before the RCT that Trailways' intrastate revenue is 8.562¢ per passenger-mile while its interstate revenue is only 6.985¢ per passenger-mile. Similarly, Texas introduced evidence that Greyhound's intrastate revenue is 7.432¢ per passenger-mile, while its interstate revenue is only 5.832¢ per passenger-mile. This evidence is based upon cumulative averages, however, and noteably fails to compare intrastate and interstate revenue per passenger-mile for journeys of comparable length. For example, in its rebuttal before the Commission, Trailways correctly acknowledged that a comparison of revenues or fares for intrastate and interstate trips of comparable length is more illustrative of differing rates and gave the following illustration:

[I]f a passenger were to purchase a ticket today from Dallas, Texas to Shreveport, Louisiana and from Dallas, Texas to Waskom, Texas, which represents a mileage difference of approximately 22

miles, the standard interstate fare would be $31.00, or .1422 cents per bus mile in revenue, while the intrastate fare would be $17.05, or $.0870 cents per bus mile in revenue.

Notwithstanding the remaining question— are the "standard" interstate fares representative of the actual fares charged or should excursion fares be considered (and if the latter, whether the interstate fare would be lower in this example)—, we agree that a comparison of the actual fares charged of comparable length journeys is the preferable data for revealing unequal or discriminatory rates.

The Commission rejected the RCT's revenue per passenger-mile comparisons because the data used by the RCT compared, on a cumulative average basis, a large number of relatively short intrastate trips with interstate trips of much greater average length. As support for its action, the Commission has aptly stated in another proceeding:

It is well known that the costs of transportation by bus and by virtually every other mode are not directly proportional to length of haul, but that costs per mile for short trips are typically much higher than for long trips. This reflects the influence of costs of ticketing, baggage handling, other station expenses, and other expenses which do not vary significantly (or at least not proportionally) with the length of the trip. This in turn is reflected in the rate structure for bus and virtually all other forms of transportation: rates or fares per mile are typically much higher for short trips than for long trips. The higher short haul rates or fares per mile reflect the fact that short haul costs per mile are significantly higher.

---

**4.** The State of Texas argues in the alternative that even if the presumption of an unreasonable burden on interstate commerce was raised, this proof of *actual* "rates" effectively rebutted the presumption. It is unclear, however, whether the State also asserts that the higher intrastate revenue per passenger-mile data lend more credence to its argument that the ICC's review of

only the published rates was erroneous. Because we conclude that the revenue per passenger-mile data offered by Texas are misleading and unpersuasive, *see* part III A., *infra,* we do not consider this data offered by the State in determining the propriety of excluding excursion fares from the comparison of intrastate and interstate rates.

*Greyhound Lines,* ICC Decision No. 10921, at 3 (April 18, 1984) (not printed), *aff'd sub nom. Public Service Commission of West Virginia v. ICC,* 749 F.2d 32 (4th Cir.1984). We agree with the foregoing reasoning of the Commission. The State of Texas' revenue per passenger-mile data fail to take into account the disparate costs between interstate and intrastate service.[5] Accordingly, the Commission properly rejected the RCT's revenue per passenger-mile comparison.

## B. Excursion Fares

■ Our agreement with the Commission with respect to its rejection of Texas' revenue per passenger-mile data does not also resolve the issue of the Commission's failure to consider excursion fares. In its decision in the Greyhound petition, the Commission explained its general policy excluding consideration of excursion fares:

> The Commission has specifically addressed and rejected the argument that an effective rate comparison as contemplated by subsection 11501(e)(2)(A)(i) must take into account excursion fares and other discounts applicable to a petitioner's interstate rate structure. See, for example, No. MC–C–10866, *Petition of Greyhound Lines, Inc., for Review of a Decision of the California Public Utilities Commission Pursuant to 49 U.S.C. 11501* (not printed), decided September 9, 1983. Promotional-type discount or ceiling fares or rates for certain qualifying traffic are generally initiated for promotional or advertising purposes

and are frequently effective only for limited time periods. Therefore, we have concluded that such reduced rate options should generally not be considered in making rate comparisons under § 11501(e)(2)(A)(i).

*Greyhound Lines,* ICC Decision No. 10893, at 4 (February 21, 1984); *see also Trailways Lines,* ICC Decision No. 10891, at 6 (January 31, 1984). We disagree with this general policy.

The application of the foregoing policy in actions such as these results in a comparison of rates that do not necessarily reflect the actual rates charged. Because the Commission impliedly agrees that the statute requires a comparison of *actual* rates charged,[6] its failure to consider the excursion fares resulted in decisions that were not "based on a consideration of the relevant factors" and that were the product of "a clear error of judgment." *Volpe,* 401 U.S. at 416, 91 S.Ct. at 823. Accordingly, for this reason and for the reasons that follow, the decisions of the Commission are reversed and these actions are remanded so that the Commission may compare intrastate rates with interstate rates taking into account the impact of excursion fares.

The State of Texas brought forth considerable evidence that passengers traveling in interstate traffic were doing so at excursion fare rates in a majority of cases. The RCT, in its original proceeding, surveyed a sample of tickets issued for interstate travel selected by Greyhound and found that 89% of those tickets represented excursion fares. Although Greyhound stated in its

---

5. The State of Texas objects strongly to the Commission's statement that "comparisons of revenue per passenger-mile for interstate and intrastate services do not determine the relative profitability of these services absent a similar comparison of costs." *Greyhound Lines,* ICC Decision No. 10893, at 4 (February 21, 1984). Texas contends that the statute's reference to rates "charged" speaks to revenue and not to profitability. *See* 49 U.S.C. § 11501(e)(2)(A)(i). While the plain meaning of the statute supports Texas' interpretation, we are of the opinion that the Commission's reference to "profitability" more likely than not was a reference to the disparate cost structures of intrastate and interstate traffic. Nevertheless, we need not decide whether a comparison of profitability is appropriate under

§ 11501(e)(2)(A)(i) as we believe the Commission was entirely correct in concluding that the lower cost factors for lengthy interstate trips (of considerable length across some points of Texas) as compared to higher costs for short intrastate trips rendered Texas' statistics misleading and unpersuasive.

6. In justifying its general policy excluding excursion fares, the Commission argues that the "published, base rate is the rate that is charged normally." The premise of such an argument is that excluding excursion fares is proper because the Commission is still comparing the *actual* rates charged.

rebuttal before the Commission that it was unable to determine how the RCT arrived at this percentage, it admitted that 67% of the tickets were purchased at an excursion fare. The Commission noted that these excursion fares were employed for a limited time; however, the record indicates that the Joint Reduced Fare Tariffs of Greyhound have no expiration date. Moreover, the record indicates further that Trailways' Excursion Fare Tariff was in effect for over six months. This evidence is certainly sufficient to raise a serious question before the Commission as to whether it could justifiably invoke its general policy excluding consideration of excursion fares and still expect to make a valid comparison of the actual rates charged in intrastate and interstate traffic.

Greyhound did submit some data that took excursion fares into account. Greyhound submitted a table comparing intrastate and interstate fares for travel between various cities, organized by mileage brackets. Certain entries are, in fact, based on temporary competitive reduced fares and it appears that, even with the reduced fares, the interstate rate per passenger-mile is higher than the intrastate rate per passenger-mile. However, there is no indication from Greyhound or from the Commission whether the data selected by Greyhound is exhaustive of the excursion fares offered. Trailways, on the other hand, submitted no data involving excursion fares. Greyhound's data failed to conclusively show either that excursion fares represented an insignificant percentage of interstate revenue or that the rebuttable presumption should have been invoked even if the Commission had considered the excursion fares.

While determining the impact of excursion fares upon intrastate and interstate rates and weighing the evidence before it is a task particularly well suited to the Commission, it has neither the authority nor the discretion to entirely disregard excursion fares in making rate comparisons under § 11501(e)(2)(A)(i). Because the statute contemplates a comparison of the *actual* intrastate and interstate rates, we hold that the Commission should not invoke its general policy—that excursion fares should not be considered in comparing intrastate and interstate rates—unless it has found that to do so would nevertheless yield a reasonable approximation of the actual rates charged. The Commission, of course, must be allowed certain latitude in efficiently and effectively exercising its agency functions. *American Trucking Ass'n, Inc. v. United States*, 642 F.2d 916, 920 (5th Cir. 1981); *State of Texas v. United States*, 642 F.2d 87, 89–90 (5th Cir.1981). On the other hand, states and state regulatory bodies have an interest in ensuring that intrastate rates will not be preempted unless discriminatory rate structures actually exist. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) ("Where, as here, the field which Congress is said to have pre-empted has been traditionally occupied by the States, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was clear and manifest purpose of Congress.' This assumption provides assurance that 'the federal-state balance,' will not be disturbed unintentionally by Congress or unnecessarily by the courts.") (citations omitted). Accordingly, a balancing of these interests leads this Court to conclude that the Commission's exercise of its general policy excluding consideration of excursion fares is to be sanctioned only in those cases where it has found that the published rates, in fact, represent a reasonable approximation of the actual rates. In all other cases, the Commission is bound to consider excursion fares and assess their impact on intrastate and interstate rates.

Our holding today is supported by several considerations. First, we are convinced that the purpose of the Bus Act is furthered by imposing this requirement upon the Commission. We note, initially, that none of the parties has cited any legislative history defining or interpreting the phrase "rates charged" as it appears in § 11501(e)(2)(A)(i). Similarly, this Court has uncovered no support in the legislative

history for the parties' positions. Nevertheless, the statute represents the response to a clear concern with the need for uniformity in the national transportation system. 127 Cong.Rec. H8588 (daily ed. Nov. 19, 1981) (remarks of Rep. Clausen). More specifically and with respect to the preemption of state regulation provided by § 11501(e)(2)(A)(i), the Senate recognized that "the carrier who is unable to raise rates high enough on its intrastate route is forced to charge its interstate travelers an inequitable price to remain financially viable. The impact of such practices presents a substantial burden on interstate commerce." S.Rep. No. 97–411, 97th Cong., 2d Sess. 8, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2308, 2315 (Senate Report). It is this inequality of rate structures which resulted in the inclusion of § 11501(e)(2)(A)(i) as an amendment to the Bus Act and led the conference committee to find that "the existing Federal and State regulatory structure has tended to impair, in certain circumstances, the ability of carriers to enter markets and to maximize use of equipment and opportunities to expand." H.Conf.Rep. No. 97–780, 97th Cong., 2d Sess. 32, *reprinted in* 1982 U.S. Code Cong. & Ad.News 2342, 2343 (Conference Report).

Were we to allow the Commission, through its newly acquired power, to preempt state regulations and prescribe intrastate rates without first requiring it to determine whether a disparity between intrastate and interstate rates actually exists, the ICC could exercise this power in situations in which the evils that led Congress to create this power do not exist. Such a result would contravene the very purpose of the 1982 amendment. Accordingly, Congress' concern with the burden imposed upon interstate commerce by an *actual* disparity of intrastate and interstate rates leads us to conclude that the Commission in certain instances must examine the impact of excursion fares upon interstate rates in its § 11501(e)(2)(A)(i) analysis.

Second, the Commission's general policy excluding consideration of excursion fares

presents a unique opportunity for active misrepresentation of actual interstate rates by carriers in an effort to induce the Commission to preempt state regulated rate ceilings. By artificially increasing published interstate rates while maintaining actual, reduced interstate rates through extended excursion fares, carriers could rely upon the Commission to find that intrastate rates are lower than interstate rates and consequently to adjust upwards their intrastate rates. The State of Texas contends, in its brief on appeal, that "the regulatory agency could order rates published which are three hundred percent (300%) higher than interstate tariffs, then prescribe 'working' tariffs in effect for indefinite periods of time. The published rates would bear no relationship to what the carrier was actually paid." While we may disagree with the extent of possible misrepresentations predicted by Texas, we nevertheless consider the possibility of such representations sufficiently disturbing to warrant the requirement that the Commission review not only the published fares but also the excursion fares.

Third, we reject the Commission's sole argument in support of its general policy excluding consideration of excursion fares. The Commission argues, in its brief on appeal, that its policy is "supported by the strong public policy favoring the elimination of inter- and intra-state rate disparities." The Commission then asserts that "[b]ecause the Commission's interpretation is reasonable and entitled to great deference, it should not be disturbed." (citing *National Ass'n of Greeting Card Publishers v. United States Postal Service*, 462 U.S. 810, 820, 103 S.Ct. 2717, 2725, 77 L.Ed.2d 195, 204 (1983); *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981)). There is an inherent failure of logic in such an argument. The Commission fails to recognize that a policy excluding consideration of excursion fares will not accurately determine the actual intrastate and interstate rates charged and consequently will cause the Commission to overestimate rate dis-

parities. In some instances, the Commission may determine a rate disparity where none, in fact, exists. In such cases, the Commission's exercise of its preemption power will result in the prescription of intrastate rates which exceed the "actual" interstate rates. Moreover, there is no logic to the argument that the Commission's policy is supported by "the strong public policy favoring the elimination of inter- and intra-state rate disparities," when a disparity of rates does not actually exist. We reject the Commission's argument that the admittedly important goal of eliminating intrastate and interstate rate disparities somehow lends support to a policy of the Commission that refuses to examine the rates the carriers are actually charging.

For the foregoing reasons, we conclude that the Commission's decisions in these matters should have given consideration to excursion fares in determining whether the published rates of these carriers in fact represented a reasonable approximation of the actual rates charged. Since the Commission has failed to do so, a clear error of judgment has resulted; accordingly, we find the Commission's findings were "not in accordance with law." 5 U.S.C. § 706(2)(A) (1977). The decisions of the ICC will be set aside and these actions will be remanded for further proof in order for the Commission to determine the impact of excursion fares as part of the § 11501(e)(2)(A)(i) analysis.

### IV. *Package Express Rates*

■ The State of Texas challenges the jurisdiction of the Commission over intrastate package express rates.[7] It argues that the plain meaning of § 11501(e)(2)(A)(i)

which refers to "interstate transportation of passengers" calls for the presumption to apply only to movement of people, not property; that the wording of the statute is clear; and that, consequently, there is no need to look beyond the official text of the statute. *See, e.g., Steere Tank Lines, Inc. v. ICC*, 724 F.2d 472, 477 (5th Cir.1984). We disagree with Texas' initial premise that the plain meaning of the statute is clear.

Initially, we set forth the relevant provisions of 49 U.S.C. § 11501(e), the statute in dispute:

> (2) For purposes of paragraph (1)(B) of this subsection, there shall be a rebuttable presumption that—
>
> (A) any rate, rule, or practice applicable to *transportation provided by a motor common carrier of passengers* entirely in one State imposes an unreasonable burden on interstate commerce if the Commission finds—
>
> (i) that such rate, rule, or practice results in the carrier charging a rate for *such transportation* which is lower than the rate such carrier charges for *comparable interstate transportation of passengers;*

(emphasis added). In support of its argument that § 11501(e)(2)(A)(i) applies only to rates for transportation of passengers and not for transportation of property, Texas points out that while § 11501(e)(2)(A) refers broadly to all types of transportation provided by motor common carriers, the language of § 11501(e)(2)(A)(i) is more concise and refers only to "comparable interstate transportation of *passengers.*" (emphasis added). Rather than conclude that such

---

7. Initially, Texas argued that the § 11501(e)(2)(A)(i) presumption is not applicable to package express rates. In response to the Commission's contention that Texas' argument was not raised before the Commission and therefore waived, Texas concedes that "this question goes to the jurisdiction of the ICC over package express rates." While our resolution of the jurisdictional issue, *see* part V, *infra,* might leave unresolved the question of the applicability of the § 11501(e)(2)(A)(i) presumption to package express rates, we believe that the Commission's utilization of the subsection (c) rebut-

table presumption in the course of its decision places the question properly before this Court. The Commission's application of the presumption to package express rates can be inferred from language in the decision that "Greyhound's allegation that the intrastate rates sanctioned by the RCT are .. burdensome to interstate commerce stands *unrebutted,* except for *package express rates* in the 0–10 pound, category." ICC Decision No. 10893, *supra,* at 5 (emphasis added). Accordingly, we proceed to determine the applicability of the § 11501(e)(2)(A)(i) presumption to package express rates.

language is clear or that such language evidences a clear intent on the part of Congress to apply this presumption only to transportation of passengers, we believe a review of the legislative history is warranted because of the statute's inherent ambiguity and because Texas' reading of the statute conflicts with Congressional aims embodied in the Bus Act. *See, e.g., Steere Tank Lines, Inc.,* 724 F.2d at 477–78.

As Texas properly points out, the language of § 11501(e)(2)(A) is broad; it impliedly refers to all forms of transportation of a motor common carrier including transportation of property—*e.g.,* package express. Nevertheless, the language of § 11501(e)(2)(A)(i) compares "such transportation"—*i.e.,* all forms of transportation of a motor common carrier, including package express—to "comparable interstate transportation of passengers." It is illogical to compare the rates of several forms of transportation to the rates of one form of transportation (passenger service). If Congress had intended to only compare intrastate and interstate passenger rates, it might very well have added the words "such transportation *of passengers* " to the language of § 11501(e)(2)(A)(i). As we are convinced that the language of the statute is unclear, we turn to the legislative history of the 1982 amendment.

Our review of the legislative history of the Bus Act uncovers no evidence that Congress considered applying the rebuttable presumption of subsection (i) only to passengers. On the contrary, the reports of the House, Senate and of the conference committee make clear that the entire procedure for the preemption of state rates, rules, or practices provided by 49 U.S.C. § 11501(e) applies also to package express

rates. For example, in the Conference Report, *supra,* at 52, *reprinted in* 1982 U.S. Code Cong. & Ad.News at 2363, the committee described the Senate amendment, which was adopted by the conference committee, in the following manner:

> The Senate amendment creates a new subsection (e) to section 11501 which details the procedure for preempting State decisions with respect to rates and practices. *This procedure would also apply to State rate decisions affecting package express rates or practices....*

> There is a rebuttable presumption that any intrastate bus rate, rule or practice imposes an unreasonable burden on interstate commerce if the ICC finds that: (1) such rates, rule, or practice results in the carrier charging a rate for intrastate transportation which is lower than the rate for comparable interstate transportation; ....

(emphasis added). *See also* Senate Report, *supra,* at 28, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2308, 2335; H.R.Rep. No. 97–334, 97th Cong., 1st Sess. 45 (1982). As the Commission noted in its brief on appeal, "[a]ll three reports directly apply the procedures of Section 11501(e) to package express rates, and all three exclude the words 'of passengers' in describing the rebuttable presumptions of Section 11501(e)(2)(A)." We can only conclude from the clear and consistent message imparted in the legislative reports that Congress did not intend to exclude package express rates from the provisions of § 11501(e)(2)(A)(i). Consequently, we hold that the rebuttable presumption of subsection (i) applies to package express as well as passenger rates, rules and practices.[8]

---

**8.** Although the legislative history provides this Court with a clear picture of Congress' intent, we are not unmindful that the Commission's application of the rebuttable presumption to package express rates constitutes "the construction of a statute by [the party] charged with its execution" and that such a construction "should be followed if it is reasonably defensible." *United States Department of Justice v. Federal Labor Relations Authority,* 727 F.2d 481, 486 (5th Cir. 1984) (citations omitted). In addition, this Court will normally defer to the Commission's

interpretation of the scope of the statute, "[p]articularly ... when the administrative practice at stake 'involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are as yet untried and new.' " *Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers, AFL–CIO,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961) (quoting *Nor-*

## V. *Preemption Jurisdiction*

■ The State of Texas and Greyhound, as intervening respondent, challenge the jurisdiction of the ICC to set intrastate charter rates. Texas also challenges the jurisdiction of the Commission to set intrastate package express rates. Upon reviewing the relevant statutory provisions of the Bus Act, we are convinced that the Bus Act empowers the Commission with the authority to preempt state rates, rules and practices with respect not only to passenger rates but also to intrastate charter and package express rates. Because the statutory language is clear and because adopting Texas' position would contravene the central purpose of the Bus Act, we conclude that § 11501(e) grants the ICC jurisdiction to preempt and set intrastate charter and package express rates.

The State of Texas notes that § 11501(e) limits the scope of the Commission's preemption power to cases involving "any rate, rule or practice applicable to transportation provided entirely in one State by a motor common carriers of passengers providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of [Title 49]...." The Commission's jurisdiction under subchapter II is prescribed by 49 U.S.C. § 10521, which in turn, Texas asserts, limits the Commission's power to prescribe rates for intrastate transportation to the type of transportation that is subject to Commission's jurisdiction under 49 U.S.C. §§ 10922(c)(2) and 11501(e). Section 10922(c)(2) clearly provides that the Commission has jurisdiction over carriers providing "regular-route transportation." As a result, Texas argues that because intrastate charter service is not "regular-route transportation," the

Commission does not have jurisdiction under 11501(e). In furtherance of this argument, Texas asserts, without support, that the Bus Act evidences an intent not to grant the ICC jurisdiction over intrastate charter operations and charges and that the legislative history of the statute further evidences Congress' intent to provide for the preemption of intrastate regular-route transportation and not the preemption of intrastate charter transportation. We disagree.

As Texas properly notes, the scope of the Commission's jurisdiction is set forth in 49 U.S.C. § 10521. Subsection (b)(2) to that provision authorizes "the Commission to prescribe or regulate a rate for intrastate transportation provided by a motor carrier" "except as provided in sections 10922(c)(2) and 11501(e)." Texas fails to explain why we should read this language to empower the Commission with jurisdiction as provided by § 10922(c)(2) and not also as provided by § 11051(e). We agree with the Commission's assessment that "because sections 10922(c)(2) and 11501(e) are two entirely separate intrastate rate provisions, there is no basis for the RCT's contention that the former somehow limits or restricts the latter." *Greyhound Lines*, ICC Decision No. 10893, at 2 (August 17, 1984) (on petition for reconsideration of ICC's decision of Feb. 21, 1984).[9] Accordingly, the Commission's jurisdiction may be determined by looking at the language of § 11501(e) itself. Our review of that provision leads us to conclude the Commission has jurisdiction to review and prescribe intrastate charter and package express rates.

Section 11501(e)(1) provides that "[t]he Commission shall prescribe *any* rate, rule or practice" applicable to intrastate trans-

---

*wegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933)). *See also Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, ——, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). The Commission's application of the rebuttable presumption of subsection (i) to package express rates was proper.

**9.** The Commission further stated that:

[s]ection 10922(c)(2) at (D) provides the Commission with interim rate jurisdiction over intrastate regular-route operations authorized in subparagraphs (A) and (B) until permanent rates are established at the State level, while section 11501(e)(1) allows the Commission, under certain circumstances, to review intrastate rates, rules, and practices prescribed by the States which unreasonably burden interstate commerce.
ICC Decision No. 10893, at 2 (Aug. 17, 1984).

portation provided by a carrier which also provides transportation that is subject to the jurisdiction of the Commission. (emphasis added). The plain language of the provision entrusts the Commission with the power to prescribe "any," and therefore "all," rates charged by the applicable carriers. Moreover, Texas' contention that the language at the end of subsection (e)(1)—"subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title"—somehow limits the Commission to a review of intrastate regular-route rates is misplaced. Rather, we agree with the Commission's interpretation that such language "was added only to ensure that the Commission's review and prescription of intrastate rates was confined to those of interstate motor carriers of passengers." *Id.* Accordingly, we hold that intrastate charter rates and package express rates are subject to the Commission's preemption powers.

Our holding today is supported further by the fact that Congress, in other sections of the Bus Act, has expressly and selectively singled out charter transportation from other types of transportation. For example, 49 U.S.C. § 10708(d)(4) provides, under certain circumstances, that

[n]otwithstanding any other provision of this title, the Commission may not investigate, suspend, revise, or revoke any single-line rate proposed by a motor common carrier of passengers, or joint rate proposed by one or more such carriers, applicable to any transportation (*other than special or charter transportation*) on the grounds that such rate is unreasonable on the basis that it is too high or too low....

(emphasis added). Consequently, had Congress intended to limit the jurisdiction of the ICC to a review of regular-route rates, and to exclude the Commission's review of

charter rates, it would have expressly singled out charter transportation as it did in § 10708(d)(4).

The Commission's jurisdiction over intrastate charter rates and package express rates under § 11501(e)(1) is also supported by legislative history and by the purpose of the Bus Act. In discussing the Senate amendment to § 11501(e), which was adopted by the conference committee except for minor technical changes, the Conference Report states:

The Senate amendment, with two exceptions, confers a review power in the ICC with respect to all proposed increases in intrastate passenger fares and express rates. The first exception is that the States would retain full authority over the rates of carriers owned by or controlled by a State or local government. Secondly, State ratemaking authority over the intrastate rates of solely intrastate carriers would not be affected.

Conference Report, *supra*, at 52, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2363. The committee's failure to mention intrastate charter rates within the reach of the two exceptions provides support for the Commission's position.[10] Moreover, as Greyhound properly asserts, in its brief as intervenor, "[n]ot only does RCT's truncated view of the ICC's preemptive authority find no support in the statutory language, such [a] view would also be contrary to Congress' intent to eliminate burdensome and discriminatory State rates, rules and practices." One of the principal goals of the Bus Act is the elimination of "the previous lack of uniformity in standards and procedures that governed rate-setting by interstate rail carrier...." *State of Texas v. United States,* 730 F.2d 339, 347 (5th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). In addition, the Senate Report noted that "a large number

---

**10.** We recognize that the Conference Report specifically describes the ICC's review power "with respect to all proposed increases in intrastate passenger fares and express rates." While this statement lends direct support for the Commission's jurisdiction over package express rates, intrastate charter rates are not mentioned as

being within the Commissioner's review power. Our prior discussion of the broad language of § 11501(e), however, resolves this issue; consequently, the absence of intrastate charter rates from the two exceptions to the ICC's broad review power is probative.

of routes, particularly intrastate routes serving rural communities, are cross-subsidized by more profitable interstate routes and charter operations." Senate Report, *supra,* at 8, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2315. Precluding burdens on interstate commerce, including burdens on interstate charter operations, that result from a lack of uniformity in rate structures is a primary goal of the Bus Act; consequently, it is highly improbable that Congress would fail to grant the Commission the preemptive power necessary to reach that goal. The legislative history of § 11501(e) and the purpose of the Bus Act, as well as the clear language of the statute and Congress' failure to expressly exclude intrastate charter transportation from the Commission's preemption power, lead this Court to conclude that Congress empowered the Commission to preempt and prescribe rates applicable to intrastate charter transportation and to intrastate package express transportation.

## VI. *Conclusion*

We REVERSE the decisions of the Commission and REMAND these actions in order for the ICC to consider the excursion fares offered by the carriers. In order to exclude excursion fares from its comparison of intrastate and interstate rates, the Commission must expressly find that the published rates offered by each carrier, represent in fact a reasonable approximation of the actual rates charged. If the Commission does not so find, it must then consider the excursion fares in its § 11501(e)(2)(A)(i) analysis. In all other respects, the petitions for review are DENIED.